Thank you. Good morning. May it please the court, Jennifer Kuhn on behalf of L'Tanya Smith. I'd like to reserve two minutes for rebuttal but I understand I'll keep track of my own time. All right. This case is here after an open plea to serious health care fraud offenses. We all agree that we're here on plain-air review and I'm aware that's a very high standard to meet. Nevertheless, this court should vacate the sentence and remand for resentencing so that the district court can correct its serious sentencing errors and avoid unwarranted sentencing disparities with the co-defendant, Sarkissian, who was sentenced under inconsistent theories of loss. So, as I understand it then, this is the thing that makes this a little difficult for you, I think. Nobody challenges the PSR in the district court and the only challenge you're doing now, really, I guess, is that you're arguing that a co-defendant who proceeded to trial and was found guilty, that their argument regarding intent and extent of fraud in sentencing should somehow be imported into your own or into your own clients? Well, Your Honor, I do think there was really a failure of the adversarial system here at sentencing and... Well, I appreciate your reasoning but I guess what I'm trying to get at is nobody's challenging the PSR, nobody challenged even this, I mean, the plea was made, nobody challenged anything about the elements of the intent or any of that, just after looking at what happened at another trial with another defendant who was also found guilty and the argument they made, we're now to consider that argument in this case. Your Honor, we are here under plain error review because the defense counsel at trial did not raise these errors at sentencing but the court and... Isn't that an ineffective assistance of counsel argument? I'm sure, I hope that that will be litigated on habeas if this court doesn't step in but I do think that this court has the power to correct these errors even under plain error review and that's because the government advanced inconsistent theories of loss as to this defendant and the co-defendant who was sentenced just weeks later. The relevant evidence for the court and the government to consider was all in the record at the time of Ms. Smith's sentencing and the... I just think it's a failure of justice and it satisfies the plain error standard when the government advances inconsistent theories and the court applies inconsistent theories to result in a dramatic unwarranted sentencing disparity. Well, but the problem comes in what your client admitted. She admitted she sees nearly all the patients at the clinic. She admitted she knew the patients were largely brought in by the marketers. She ordered the medically unnecessary tests and sometimes those tests were not even administered. She admits that. She admits she orders the tests both through her office and through referrals to other providers. I've written this down because this is what she said. She admits she created the false documentation indicating the patients had conditions they didn't actually have and she admits that the total amounts billed to Medicare from her clinic were, and then she says what that is, and that she'd also done the referrals to other providers. After that, I'm trying to figure out with all those admissions and no objections to the PSR how I can get that there's any plain error even if we get to the last standard which you now want to argue. Did she admit intended loss? No, your honor. She admitted an amount that was the clinic had billed Medicare for direct billing and an amount that Medicare had paid the clinic. She did not admit the amount of referral billings and then she did not, her counsel did not challenge the pre-sentence reports findings as to intended loss. And the referral billings, as I understand it, were the largest amount. Yes, your honor. It was about $10 million. Right, that's correct, close to $11 million. But she did admit that she'd done the referrals to the other providers, right? Yes, your honor. But it was the co-defendant who, as the government argued at his sentencing just weeks later, was actually in charge of the clinic's billings and as the government argued had actually billed items that Ms. Smith had not approved of and was not even aware of. So the government argued at the co-defendant's sentencing that he was the more culpable one and yet the government accepted his declaration that his intended loss should be lower because he was aware of the allowed amount rule under Medicare that Medicare would not necessarily bill the full amount. Now Ms. Smith, who's not even doing the billing, is being held responsible for the entire amount, not only of the clinic's billing but of the referral's billing, even though her involvement in billing was much less and her awareness and understanding of the scheme was much less. What do I do with Popov, which says at 742 Fed 3rd 916, in health care fraud cases the amount billed to an insurer shall constitute prima facie evidence of the intended loss for sentencing. Yes, your... If it's not rebutted, this evidence is sufficient evidence to establish the intended loss by preponderance of the evidence. Your Honor, however, Popov does also provide that that prima facie showing can be rebutted with... Well, what was the rebuttal here based on what she admitted? She did not admit intended loss as to the entire amount of the clinic's billing and the referral billings. I understand there was a failure to challenge the pre-sentence report, but at the time of her sentencing there was evidence in the record from the person who did the billing, who was Mr. Sarkissian, that he understood that the entire amount of the billing would not be paid. So that evidence was sufficient under Popov to rebut the government's prima facie showing. And really it would be... which government witness it was, discussing this issue when it says there is a manual to tell physicians or physician's assistants how to use the fee schedule. And then later on in the testimony there is an admission that for all practical purposes it's widely known that Medicare never pays the amount billed, that physicians are supposed to bill what they would normally charge. And there was a Medicare schedule that provided the amount for the service and it would never be what was billed. So that was, I'm looking at somewhere from pages 99 to 102 of the excerpts from the record so there was record evidence that the amount billed would never be paid by Medicare above what it allotted for the particular service and that, and I have a Q&A here, this is a manual to tell physicians, but more importantly in light of one of the arguments the government makes, or physician's assistant, how to use the fee schedule, isn't it? And he says yes. And later on he also acknowledges that this is pretty much widely known. Yes, Your Honor, I do think that the evidence at trial, which the government and the court was aware of and Ms. Smith did not attend, as well as the declaration submitted by the co-defendant who actually did the billing, that those two items together were sufficient to rebut the prima facie showing under PAPA. And really it's illogical to hold the person who's less responsible for the billing responsible for such a dramatically higher loss amount, as well as a restitution amount basically ten times higher than the co-defendant, although they were held jointly and severally liable. Well, let's think about that. She signs the referrals for the fraudulent work to be provided by the providers. Her co-defendant, the office manager, did not write the deferrals. Correct. She wrote the prescriptions. But your client did. Your client signed the referrals for the fraudulent work. Correct. So there the co-defendant, as the office manager, didn't write the referrals. So why is there error in imposing a higher restitution amount on your client? Because, Your Honor, it was the government's theory that the co-defendant was the more responsible party who was laundering the proceeds. Well, they said that in that trial. You never had them go to trial in your trial. No, Your Honor, I wasn't. The counsel below. No. No. And then instead your client admits all of these things that I've seen in the record. She admits she did the billing as to her own clients. And then she admits she does the referrals to the other clients. And the other defendant doesn't even write the referrals. And yet I'm supposed to suggest, even though the government makes argument, the government make argument what they want. They want to convict both. But my worry is, looking at this, and given what she admitted, I'm having a tough time with plain error. Your Honor, there was no evidence that 100% of the referral billings were fraudulent. There was evidence that Ms. Smith was less involved in billing and laundering proceeds than her co-defendant. And the theories apply. Less involved in that she didn't write the prescriptions. But she writes the referrals for all of this work. And her co-defendant did not. That's correct, Your Honor. Can I ask you one question? The amount of restitution, as I understand it, is based on actual loss. So you have what looks to me like a somewhat anomalous situation where the restitution is the actual loss, but the sentence is not based on the actual loss to the government, but on the amount billed. Correct. The sentence was based on the amount of intended loss using the entire amount billed rather than the allowed amounts by Medicare. And yet, Ms. Smith was also held responsible for an entire actual loss, including the referral billings, jointly and severally with her co-defendant, who nevertheless wasn't held responsible in his own sentencing. And do you know whether any effort, you know, I sit on a district court, so I do this all the time, or I see it all the time, but when there's a plea like this, the lawyers tend to negotiate, among other things, what will the defendant will be held accountable for. And at least in my court, they do an estimated calculation of what the guidelines would be. Was there any effort, do you know, to engage in any kind of negotiation about what the government would insist on in intended loss? I don't know, Your Honor. I'm not privy to that information. Perhaps the government could answer that question. It's unclear to me why the trial counsel handled it in this way, but I do think that there's an opportunity here to remand the case to the district court so that the two defendants can be sentenced consistently. Well, I don't know that we could remand the two for that, but I understand the other defendant has got an appeal pending, and without passing judgment on him, the district court upwardly departed, so he wouldn't be upwardly departed for the sole reason that it wouldn't appear that there was any disparity in sentencing with your client. But let me make a suggestion to you. I don't know how this appeal is going to turn out. We don't have any discussions beforehand, but from my reading of Popoff, there's certainly a basis to support the fact that evidence in the record, in fact, two of the cases that are cited in Popoff were, I believe, remands based on evidence in the record, which regarding the difference between intended loss and actual loss, and I would suggest that, depending on how this case turned out, that you file a petition for a writ of habeas corpus alleging ineffective assistance of counsel. Thank you. I think that's where we need to go here. I mean, my understanding, and you can correct me, that the Medicare amount was the only thing imposed in restitution. Yes, it was the amounts paid. It was $4 million. Correct. And she, that, for, I don't know. But we're not talking about the billing amount. We're talking about the Medicare amount. The actual amount Medicare paid was the amount imposed in restitution. That's correct, Your Honor. All right. Thank you, counsel. We've helped you exceed your time. Yes. Thank you very much. We'll give you a minute for rebuttal. Thank you for your time. All right. Good morning, Your Honors. Kristen Williams for the United States. So the defendant's sentence, as the court has noted, was consistent with the admissions she made as a part of her plea and sentence with the undisputed findings of the PSR. No, no, no. It wasn't. She didn't, at least in the excerpts in the record, she didn't say anything about intended loss. Your Honor. In fact, the only specific amount she admitted to was something like $1.2 million with respect to the clinic. So, Your Honor, if I could point you to a couple of places with respect to her admissions that go to the point of it being related to the referral losses. So, first, I think, as the court had noted, about sort of her seeing all of the patients, her knowing that they'd come there once for the other, because it marked her. I know, but attended losses is a separate issue. Doesn't it seem, it seems incongruous to me that for the purpose of restitution, the judge sentences, imposes a restitution based on actual loss. For the purpose of sentencing, he does it on the basis of the amount billed, notwithstanding the fact that there's not only evidence at the trial, which seems to me to be fairly strong, that it was widely known, including physician's assistants. I know you make a point somewhere in your papers that, well, she wasn't really a doctor, so she didn't know about Medicare billing. But there's evidence in the record that Medicare never paid more than what their fee schedule was, that it was, the physicians were supposed to bill what the actual, what they would actually charge, notwithstanding the fact that it was more than what Medicaid care would pay, and that this was pretty much common knowledge. So this is evidence in the record, and she was sentenced first before her co-defendant, but as I did a sort of my timeline, it was clear before she was sentenced that you had You agreed with the co-defendant that the loss would actually, the intended loss was what Medicare would have paid under its fee schedule. Let me address, there's two issues here I think that are getting conflated a little bit, so I'd like to separate the two of them out. One is the sort of pop-off question of the intended loss as being the billed amount versus ends up being sort of paid amount plus would have been paid on denied claims. That's sort of the pop-off. And under pop-off, there is a prima facie showing that it is in the intended amount is the amount billed. That's been consistent in the guidelines well before pop-off even came down. Well, it's prima facie. That is true. And then subject to being rebutted, in this case, as I said, it was not rebutted. But it could be, couldn't it? I think I read there's some ambiguity in pop-off because they cite cases from other circuits which certainly suggest that the rebuttal evidence of the prima facie case can be rebutted not necessarily by an affidavit by a defendant but from evidence in the record. In fact, they cite a Fifth Circuit case and a Second Circuit case in which there was a remand and then it seemed that the court was troubled by that very fact, that there was evidence in the record. You don't deny this evidence in the record, that there was evidence at the trial that I've just gone through with you. Of course, there was also evidence. It wasn't this defendant's trial. I understand that, but you're not suggesting that it's not part of the record in the case. It is part of the record. And you also agreed with the co-defendant's argument, I believe, that even though he was sentenced a couple of weeks, a couple of days, I don't remember, 10 days perhaps, difference in the sentencing, that he had, the co-defendant, I can't tell whether it's a he or she from the name. It's Carr and Sarkisian. It's a male, yes. That he had put in his own affidavit and you basically agreed to the, that the loss calculation would be based on what the Medicare actually lost. Yes, so a couple of things, Your Honor. So one, we did agree to a lower loss amount under the sort of pop-off theory whenever Defendant Carr and Sarkisian submitted a declaration about his familiarity with the billing that goes beyond, Your Honor, the trial testimony that you're pointing to, which is a general testimony about an existence of a manual that may be familiar to a physician's assistant. We have no indication that she was actually familiar with that. I understand that. Your Honor, her own counsel in their opening brief denied or disavowed knowledge of that billing. They wanted to push the billing knowledge off onto the other defendant. I would also point to the- They wanted to push the billing off and there were a couple of Qs and As at the trial that sort of interested me on page 101. And just, I'm starting at line 18, and just for clarity, the physician is obligated to bill Medicare using their normal non-Medicare fee schedule, correct? Correct, question mark. Answer, correct, they're customary, even though they have no intent to be paid the amount billed. Correct. And then the question is, all physicians know they're not going to be paid through the usual and customary rates if they bill Medicare, right? I'm right again, question mark. I don't want to mislead you. And the witness says, that could be true, yes. This is your witness. I don't know who it is. I can't tell from the excerpt in the record, but I assume it must be someone from Medicare. Yes, I believe it was an employee from one of the Medicare administrator contractors. I think, Your Honor- Did this trouble you? I mean, I looked at the rationale for the amendments and they, for the amended, when Congress actually amended the, when the Sentencing Commission actually amended the guidelines to sort of codify the case law where they said, they indicated that it was part of it, even where it was impossible, it was intended to cover stings, so where there would be no loss or something to do with insured property. But forget that. Doesn't it trouble you that on this record, I can't believe that her lawyer knew what he or she was doing? There was no effort made, which often is the case by competent lawyers. This is the most important aspect of what the sentence was going to be. No apparent, it goes in there and no apparent effort to deal with what the government, make some arrangement with the government as to what the government would agree to on intended loss. And there's also this anomaly that restitution is ordered on the actual loss to the government and she's not sentenced on the basis of it, so the money she pays out is the actual loss and she goes to jail for some fiction about intended loss. Well, I think that, again, I want to sort of take a step back to you. One, I would disagree with the suggestion that this was a determinative factor in terms of the amount of her sentence, and that comes from what I wanted to separate out, the two issues that are getting conflated here, which is the pop-off-related issue and the referral-related billings issue. So the referral-related billings are an entirely separate question, and that actually was a much larger amount of loss than the pop-off-related question. That was the most significant part. Could you explain to me exactly how this referral billing worked? In other words, exactly what she did and exactly how it worked. I had trouble in reading the record and knowing precisely how that worked. Of course. So what the defendant admitted in this case happened is that the patients would come in by marketers. They would be brought in, recruited to the clinic, often just one time. She would order a battery of services for those patients, some of which it appears would be billed through the clinic itself, some of which would have been referred out to other clinics. She has admitted that both of those were medical. I don't understand. So she orders tests that are actually given whether they're necessary or not, or they're not given at all. Or they're not given at all, yes. She admitted that both happened. And Medicare is billed for that. And Medicare is billed. We don't know what percentage of the so-called referral fees that comes out of the clinic. Well, none of the referral fees come out of the clinic. So the clinic itself bills for what it does, whether that's providing physical therapy, whether that's providing for the allergy tests or so forth. And, again, it's billing for what it purportedly does. In this case, the evidence was demonstrating that that was not actually happening. Then there would be referrals out to other providers. For example, give me an example so I understand. Sure. So the clinic itself doesn't do, for example, a pulmonary function test. That would have been referred out to the Ronald Carlish Medical Corporation. There was a lot of testimony at trial about how that particular referral provider didn't even have any equipment. They weren't doing the services. And they would bill Medicare. And they would bill Medicare, yes. And who got that money? The Ronald Carlish Medical Corporation. So what happens when the defendant uses the licensed position that she has, and then Medicare relies on that, when she writes on the prescription that, you know, this item, you know, I want this test for this patient or I want this leg brace or back brace, then that, you know, the leg and back brace prescription might be referred out to a durable medical equipment provider. So how does she benefit if the billing, if she writes, let's say, an electrocardiogram and she sends it to somebody who does electrocardiograms, they bill, how does her clinic benefit? Is there a kickback? Well, that was the strong suggestion is that there was a kickback. Well, I don't know what strong suggestion means. Is there evidence in the record that there was a kickback? There was evidence in the record at the trial of the co-defendant. Again, it's a little awkward because we're importing the trial of a co-defendant. If it would have been the trial of a defendant, it probably would have been a little bit. But, counsel, there does not have to be a kickback in order for there to be a loss to the government. The amount is still lost to the government regardless of how the money was dispersed. That is true. And some people sell their services more cheaply than others. Some people sell their fraud more cheaply than others. I'm not disputing that. So she is now being held accountable for intended loss based on what another provider, based on services billed to Medicare by another provider. That is correct. That is correct, Your Honor, because she acts as the gateway. And she is supposed to. But prescribed by her. Yes. That's the problem. Because she referred to them, right? Yes. She acts as the gateway and writes the prescription, which then she knows is medically unnecessary. She admitted that the tests and services she ordered were medically unnecessary. And then she also knew that some of those would go to the Sunset Clinic. Some of them would go to referring billing. But we don't know what the division is. We do, Your Honor. Actually, it was $1.2 million was billed with respect to the Sunset Clinic. $10.9 million was billed by the referring providers, which unfortunately is a testament to how much damage can be done in a relatively short amount of time with these kinds of government benefit programs and health care fraud schemes. And you say there is evidence in this case that there was kickback with respect to her. In other words, one could not – I don't know why else. I mean, looking at this, what's the benefit to her or for her employer for her to write these prescriptions when the billing is going to be billed by somebody else? Well, so, again, to take a step back, the trial was a trial of the co-defendant. So the evidence at that trial was aimed at the co-defendant. Yeah, but look, you're representing the government. Even if I wanted to accept that these were – we put these in separate chambers, I'm trying to get at what is a just result here. I think that is correct, and I think that the court below was also trying to get at a just result. And I want to also – I get the impression that if he is – one of the things that always bothers me is having co-defendants because I think he got – he or she in the district court got themselves into a box. I think he – in the case that he's sentenced second, he upwardly departed, so it wouldn't look like there was a disparity in sentencing since he was the more culpable figure and he would be getting less than his less culpable employee. So the judge says, I'm going to upwardly depart to avoid a disparity, which I could understand downwardly departing to avoid a disparity, but upwardly departing, I mean, this whole thing seems to me to be quite strange. Well, I think the disparity – so the only disparity between the two is in the treatment of the referral losses. They received the same sentence. In fact, the court actually rejected our argument. Oh, that's the whole case. If you take out these $10 million, what would be her guideline range without the $10 million for these referrals? It would be the $1.2 million, so it would be four levels less without the referrals. Which four levels, by my rough calculation, again, from doing this all the time, is one level is roughly close to 10% of the sentence, 10% of the guideline sentence. So the difference is a 40% difference. I'm not saying exactly 40%. But the sole difference between these two is the treatment of the referral losses. And the government actually argued that both should be responsible for the referral losses. What the court found at sentencing is that it relied on the PSR's findings in that case because that co-defendant, who was the office manager, not the gateway licensed medical professional who got an abuse of a position of trust as this defendant did, but sort of that he actually was only doing the billing with respect to the Sunset Clinic and that he didn't write those referral prescriptions. He knew what was going on. He was the manager. I mean, if you had to do culpability here, who would you say was more culpable, the manager or her or the client in this case?  Because she's a licensed professional who enables this fraud to take place. In the other way, defendant Sarkeesian was more culpable in that he was also involved in the money laundering. Of course. Counsel, we've helped you well to save your time. Could you sum up, please? In sum, on a plain error standard, what the defendant is essentially raising is factual disputes that cannot serve as the basis for plain error. In this case, the sole difference between the two was not the pop-off argument, which is the district court actually did not apply the pop-off argument to co-defendant Sarkeesian. That was not a disparity here. It was solely the treatment of the referral losses. But he accepted it. I don't want to. He accepted. You agreed in the co-defendant's case that the loss, whatever the judge may have done when he ultimately sentenced, you agreed that basically that the loss calculation should be what Medicare would pay under its fee schedule. Counsel, I think you understand George Corman's concern. We understand your position. Thank you for your argument. Thank you. Rebuttal? I don't need there to be any rebuttal from George Corman. He seems to be assuming the lawyer and the judge on this. That's nice. That's helpful. Just very briefly, I do think there is a sufficient basis under pop-off to vacate the sentence and remand due to both the evidence at trial and to the declaration of the co-defendant Sarkeesian to reduce the bill's amounts to the allowed amount. And the district court should have an opportunity to apply that. And I wanted to just note that you're really suggesting then, if I understand your argument, that what we're going to move down from is $1.2 in the clinic down to $450,000? Yes. And from $10.9 down to the Medicare payment of $3.5? At a minimum, yes, Your Honor. That's what you're asking. Even though you know very well that's what the restitution did, you're asking us to do that as to the sentence. For nothing in the record in this particular case as to what happened with this defendant, but what happened in the record of another defendant where the government was after that defendant and made evidence or did whatever they did there, which got brought into this record by some motion or by the judge. The PSR didn't take it into account. Nobody objected to the PSR, but we're to take it on account on appeal. Your Honor, I'd respectfully submit the evidence is in the record. This was all one case. Well, it's in the record, but it has nothing to do with what happened with this defendant. Your Honor. If I'm going to find plain error, it's got to be in this record. Your Honor, I'd respectfully submit there is more than sufficient evidence in the record to reduce the intended loss to the allowed amounts. In addition, regarding the referral billings, in addition to reducing them from the $11 million to the $3.5 million, the government argued with respect to the co-defendant that the referral fraud should be inferred by a presumed kickback scheme, but there were no kickbacks to Ms. Smith. In fact, it was clear in the record that she only made wages of about $30,000 less than a third of how her co-defendant profited. So I would submit there is more than sufficient evidence and basis in the record to vacate the sentence and remand for resentencing so that the court can apply, district court can apply consistent and fair theories as to both of the defendants. All right, thank you, counsel. Thank you to both counsel and to my colleagues. The case just argued and submitted for decision by the-
judges: Rawlinson, N.R. Smith, Korman